1    LAW OFFICE OF ROBERT G.
        LOEWY, P.C.
2    ROBERT G. LOEWY (SBN 179868)
     20 Enterprise, Suite 310
3    Aliso Viejo, CA  92656
     Telephone:  949/468-7150
4    949/242-5105 (fax)
     rloewy@rloewy.com
5                                              CARELLA, BYRNE, CECCHI
     ROBBINS GELLER RUDMAN              OLSTEIN, BRODY & AGNELLO
6        & DOWD LLP                          JAMES E. CECCHI
     RACHEL L. JENSEN (SBN 211456)     LINDSEY H. TAYLOR
7    655 West Broadway, Suite 1900     5 Becker Farm Road
     San Diego, CA  92101              Roseland, NJ  07068
8    Telephone:  619/231-1058          Telephone:  973/994-1700
     619/231-7423 (fax)                jcecchi@carellabyrne.com
9    rachelj@rgrdlaw.com               ltaylor@carellabyrne.com
        – and –
10   PAUL J. GELLER                    SEEGER WEISS
     STUART A. DAVIDSON                CHRISTOPHER A. SEEGER
11   120 E. Palmetto Park Road, Suite 500   STEPHEN A. WEISS
     Boca Raton, FL  33432             55 Challenger Road, 6th Floor
12   Telephone:  561/750-3000          Ridgefield Park, NJ  07660
     561/750-3364 (fax)                Telephone:  973/639-9100
13   pgeller@rgrdlaw.com               cseeger@seegerweiss.com
     sdavidson@rgrdlaw.com             sweiss@seegerweiss.com
14
     Attorneys for Plaintiff
15
     [Additional counsel listed in signature block.]
16

17               UNITED STATES DISTRICT COURT

18               CENTRAL DISTRICT OF CALIFORNIA

19   KINGRAY INC. d/b/a LA QUINTA          )   Case No. _____
     BEER HUNTER, Individually and on      )
20   Behalf of All Others Similarly Situated, )
                                           )   CLASS ACTION
21                        Plaintiff,        )
                                           )   COMPLAINT FOR DECLARATORY
22        vs.                               )   JUDGMENT AND BREACH OF
                                           )   CONTRACT
23   FARMERS GROUP INC., FARMERS          )
     INSURANCE COMPANY, INC. and          )
24   TRUCK INSURANCE EXCHANGE,            )
                                           )
25                        Defendants.       )   DEMAND FOR JURY TRIAL
                                           )
26

27

28

Plaintiff Kingray Inc. d/b/a La Quinta Beer Hunter ("Kingray" or "plaintiff"), on behalf of itself and all others similarly situated, brings this class action against defendants Farmers Group, Inc. and Farmers Insurance Company, Inc. (collectively, "Farmers") and Truck Insurance Exchange ("Truck" and together with Farmers, "Defendants" or "Farmers"), and alleges as follows based on personal knowledge as to itself and upon information and belief as to other matters based on its counsel's investigation.   Plaintiff believes additional evidentiary support exists for its allegations, given an opportunity for discovery.

## SUMMARY OF THE ACTION

1.    Plaintiff and other businesses nationwide purchased commercial property insurance to ensure that they would not be forced to close their doors for good if they were shuttered temporarily by an unanticipated crisis.  Such a crisis is now upon us, but Farmers and other insurers are refusing to pay the claims.

2.    On March 11, 2020, the World Health Organization's ("WHO") Director General, Tedros Adhanom Ghebreyesus, declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

3.    On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.[2]  On March 16, 2020, the Centers for Disease Control and Prevention ("CDC") and members of the national Coronavirus Task

---

[1]   *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]   *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13. 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

Force issued guidance to the American public, styled as "30 Days to Slow the Spread," for stopping the spread of COVID-19. This guidance advised individuals to adopt social distancing measures, such as working from home, avoiding shopping trips, avoiding gatherings of more than ten people, and staying away from bars, restaurants, and food courts.[3]

4.      On March 12, 2020, California Governor Gavin Newsom issued a civil authority order directing California residents to cancel non-essential gatherings. On March 19, 2020, Gov. Newsom issued Executive Order N-33-20, a civil authority order that required all residents to stay home, except as needed to maintain federal critical infrastructure sectors. All California businesses not deemed essential, including plaintiff's retail locations, have been ordered to close their doors.

5.      In addition to California, the vast majority of other states across the nation have entered civil authority orders requiring residents to "stay-at-home" or "shelter-in-place" and suspending or severely curtailing business operations of non-essential businesses that interact with the public and/or provide social gathering places for residents (collectively, the "COVID-19 Civil Authority Orders").

6.      These far-reaching COVID-19 Civil Authority Orders have been financially devastating for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

7.      Many businesses have purchased insurance to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic through

---

[3]   *See The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread,* WHITE HOUSE, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus- guidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

all-risk commercial property insurance policies.   These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property.   This coverage, commonly known as "business interruption coverage, is standard in most all-risk commercial property insurance policies.

8.    Despite the provision of business interruption coverage in these policies, Defendants are denying their obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property arising from COVID-19 Civil Authority Orders put in place as a precaution to slow the contagion.

9.    Plaintiff now brings this action on behalf of a Nationwide Class and a California Sub-Class (as defined below) of policyholders who purchased standard Farmers commercial property insurance to insure property in the United States and California, respectively, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put into place by a COVID-19 Civil Authority Order.

10.    This action seeks a declaratory judgment that Farmers is contractually obligated to pay business interruption losses incurred due to plaintiff's and other Class members' compliance with COVID-19 Civil Authority Orders.   In addition, plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Farmers' breach of contract and wrongful conduct alleged herein.

### PARTIES

11.    Plaintiff Kingray Inc. d/b/a La Quinta Beer Hunter is a California corporation with its principal place of business in La Quinta, California.   Kingray operates a sports bar and grill in Riverside County, California.   Kingray's success

depends upon patrons being able to sell food, beer, and spirits, to be able to host events for its patrons at its retail businesses, and for patrons to watch live sporting events on television. On March 18, 2020, Kingray was forced to close its dining room completely due to the applicable COVID-19 Civil Authority Orders. Kingray's normal seating capacity is 150. However, by City of La Quinta mandate, Kingray was prohibited from having more than 10 people inside the establishment during open hours, including staff.

12.    Defendant Farmers Group, Inc. is a California corporation with its headquarters and principal place of business in Los Angeles, California. Farmers also does business as Farmers Underwriters Association, and owns the service marks "Farmers Insurance Group of Companies" and "Farmers Insurance Group."

13.    Defendant Farmers Insurance Company, Inc. is a Kansas corporation with its principal place of business in Woodland Hills, California. It owns subsidiaries, directly and indirectly, that issue, among other things, property insurance.

14.    Defendant Trucks Insurance Exchange is a California corporation with its principal place of business in Woodland Hills, California. Trucks is a subsidiary of Farmers and is duly qualified and licensed to issue insurance in the State of California and other states.

15.    Farmers and Trucks are referred to herein collectively as "Defendants" or "Farmers."

16.    Trucks issued the Farmers Policy No. 60669-00-43 to Kingray for the policy period of October 2, 2019, through October 2, 2020 ("Plaintiff's Farmers Policy").

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) in that this is a class action in which the amount in controversy exceeds

- 4 -

1  $5,000,000, exclusive of interest and costs, and plaintiff and at least one member of

2  the putative class is a citizen of a different state than the Defendants.

3      18.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that

4  plaintiff is located in this District and Defendants do business in this District and

5  thus reside in this District, in accordance with 28 U.S.C. §1391(c).

6  **FACTUAL BAC KGROUND**

7  **A.**    **The Global COVID-19 Pandemic**

8      19.    Viruses of the family Coronaviridae, such as Middle East respiratory

9  syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory

10 syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of

11 human life since at least 2002 and were identified in several animal hosts.[4]

12     20.    In December 2019, an initial cluster of nine patients with an unknown

13 cause of viral pneumonia was linked to the Huanan seafood market in Wuhan, China,

14 where many non-aquatic animals such as birds were also on sale.  However, one of

15 the patients never visited the market, though he had stayed in a hotel nearby before

16 the onset of the illness.[5]

17

18 [4]  *See* Roujian Lu, et al., *Genomic characterisation and epidemiology of 2019 novel
19 coronavirus: implications for virus origins and receptor binding*, CTR. FOR DISEASE
   CONTROL. (Jan. 29. 2020). https://www.cdc.gov/coronavirus/2019-
20 ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf
   (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) ß-
   coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-
21 coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably
   represent avian species.).

22 [5]  *See* Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current
23 Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL.
   RESEARCH & PUB. HEALTH, (Apr. 1, 2020), https://www.mdpi.com/1660-
24 4601/17/8/2690 (As a typical RNA virus, the average evolutionary rate for
   coronaviruses is roughly 10-nucleotide substitutions per site per year, with mutations
25 arising during every replication cycle.  This finding suggests that COVID-19
   originated from one source within a short period and was detected rapidly.  However,
26 as the virus transmits to more individuals, constant surveillance of arising mutations
   is needed.); Lu, *supra* note 4 (This finding suggests either possible droplet
27 transmission or that the patient was infected by a currently unknown source.
   Evidence of clusters of infected family members and medical workers has now
28 confirmed the presence of human-to-human transmission.).

- 5 -

21.    By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[6]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope. Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[7]

22.    The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases rapidly increasing worldwide.

23.    On January 30, 2020, WHO declared that the SARS-COv-2 outbreak constituted a public health emergency of international concern.

24.    By February 11, 2020, the novel coronavirus was named "COVID-19" by the WHO Director-General.[8]

25.    As of April 27, 2020, the number of confirmed cases of COVID-19 topped 3 million globally with over 200,000 deaths, with the United States dealing with nearly 1 million confirmed cases and over 55,000 reported deaths – more than any other country in the world.[9]

26.    The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that require ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe

---

[6]    *See* Di Gennaro, *supra* note 5.

[7]    *See id*. (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 50-cap structure and 30-poly-A tail.).

[8]    *See id*.

[9]    *See* Lateshia Beachum et al., *Live updates: States lay out plans to reopen as coronavirus cases surpass 3 million worldwide*, WASH. POST (Apr. 27, 2020), https://www.washingtonpost.com/world/2020/04/27/coronavirus-latest-news/.

manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[10]  There are no specific treatments recommended for COVID-19, and no vaccine is currently available.[11]

27.    It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, and asymptomatic transmission.[12]  Symptomatic transmission refers to transmission by a person experiencing symptoms associated with the virus who then transfers COVID-19 to another.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic persons to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[13]

---

[10]  *See* Di Gennaro, *supra* note 5 (Asymptomatic infections have also been described, but their frequency is unknown.  Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[11]  *See id*. (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.    Home management is appropriate for asymptomatic or paucisymptomatic patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[12]  *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[13]  *See id*. (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

- 7 -

28.    The incubation period for COVID-19 – the time between exposure to the virus (becoming infected) and symptom onset – is an average of 5-6 days, but can take up to 14 days.[14]  During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious.  For that reason, transmission from a pre-symptomatic case can occur before symptom onset.  Pre-symptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[15]

29.    An individual who does not develop symptoms – known as an asymptomatic case of COVID-19 – can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may have occurred.[16]

30.    Not only is COVID-19 transmitted via human-to-human contact, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces.  According to a study in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to 2-3 days on plastic and stainless steel.[17]  All of these materials are used in the preparation and service of

---

[14]  *See id.*

[15]  *See id.* (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[16]  *See id.*

[17]  *See* News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *see also* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning,

1    food by restaurants.  The results of the study suggest that individuals could get

2    COVID-19 through indirect contact with surfaces or objects used by an infected

3    person, whether or not they were symptomatic.

4    31.    The *Journal of Hospital Infection* has found that human coronaviruses,

5    such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces

6    at room temperature for up to nine days.[18] At a temperature of 30 degrees Celsius or

7    more, the duration of persistence is shorter.  Contamination of frequently touched

8    surfaces is, therefore, a potential source of viral transmission.[19]  Though this study

9    was not conclusive as to COVID-19, scientists are still grappling with the

10    implications.

11    32.    On March 27, 2020, the CDC released a report entitled "Public Health

12    Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February - March

13    2020."[20]  The report detailed how, during this time frame, COVID-19 outbreaks

14    associated with three different cruise ship voyages caused over 800 confirmed cases

15    and ten deaths.[21]  Of the individuals tested, a high proportion were found to be

16

17    administration of nebulized treatment, manual ventilation before intubation, turning
the patient to the prone position, disconnecting the patient from the ventilator, non-
18    invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary
resuscitation.").

19    [18]  *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their
inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020),
20    https://www.journalofhospitalinfection.com/action/show
21    Pdf?pii=S0195-6701%2820% 2930046-3.

22    [19]  *See id*. (Although the viral load of coronaviruses on inanimate surfaces is not
known during an outbreak situation, it seems plausible to reduce the viral load on
23    surfaces by disinfection, especially of frequently touched surfaces in the immediate
area surrounding a patient where the highest viral load can be expected.  The WHO
24    recommends ensuring that "environmental cleaning and disinfection procedures are
followed consistently and correctly.").

25    [20]  *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks
on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL
26    & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/
27    mm6912e3.htm?s_cid= mm6912e3_w.

28    [21]  *See id*. ("During February 7-23, 2020, the largest cluster of COVID-19 cases
outside mainland China occurred on the Diamond Princess cruise ship, which was

- 9 -

1    asymptomatic, which may explain the high rate of transmission on cruise ships.

2    Further, COVID-19 was identified on a variety of surfaces in cabins of both

3    symptomatic and asymptomatic infected passengers up to 17 days after cabins were

4    vacated on the Diamond Princess cruise line, but before disinfection procedures had

5    been conducted.[22]  The CDC study noted that more studies are required to understand

6    the perpetuation of transmission, but what is clear is the uncertainty around COVID-

7    19 and its implications for the lawful and safe functioning of a variety of businesses,

8    most significantly, food service businesses.

9         33.    Without a vaccine to protect against COVID-19, effective control of the

10   outbreak relies on measures designed to reduce human-to-human and surface-to-

11   human exposure.  Recent information on the CDC's website provides that COVID-

12   19 spreads when people are within six feet of each other or when a person comes in

13

14

15   quarantined in the port of Yokohama, Japan, on February 3. . . .  On March 6, cases
16   of COVID-19 were identified in persons on the Grand Princess cruise ship off the
     coast of California; that ship was subsequently quarantined. By March 17, confirmed
17   cases of COVID-19 had been associated with at least 25 additional cruise ship
     voyages. On February 21, CDC recommended avoiding travel on cruise ships in
18   Southeast Asia; on March 8, this recommendation was broadened to include
     deferring all cruise ship travel worldwide for those with underlying health conditions
19   and for persons [over] 65 years. On March 13, the Cruise Lines International
     Association announced a 30-day voluntary suspension of cruise operations in the
20   United States. CDC issued a level 3 travel warning on March 17, recommending that
     all cruise travel be deferred worldwide.").

21   [22]  *See id.* ("Cruise ships are often settings for outbreaks of infectious diseases
22   because of their closed environment, contact between travelers from many countries,
     and crew transfers between ships. On the Diamond Princess, transmission largely
23   occurred among passengers before quarantine was implemented, whereas crew
     infections peaked after quarantine. . . .  On the Grand Princess, crew members were
24   likely infected on voyage A and then transmitted [COVID-19] to passengers on
     voyage B. The results of testing of passengers and crew on board the Diamond
25   Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the
     time of testing. Available statistical models of the Diamond Princess outbreak
26   suggest that 17.9% of infected persons never developed symptoms. . . . A high
     proportion of asymptomatic infections could partially explain the high attack rate
27   among cruise ship passengers and crew. . . .  Although these data cannot be used to
     determine whether transmission occurred from contaminated surfaces, further study
28   of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

- 10 -

1    contact with a surface or object that has the virus on it.[23] Various other sources state

2    that close contact with a person with the virus or surfaces where the virus is found

3    can transmit the virus.[24]

4          34.    The secondary exposure of humans to contaminated surfaces is

5    particularly acute in places where the public gathers to socialize, eat, drink, shop,

6    find entertainment, and recreate.  This is why the CDC recommends that in viral

7    outbreaks individuals who are infected stay at home and those who are not sick

8    engage in preventive measures such as constant hand washing and avoiding

9    activities that would bring them into the close proximity of people with the virus or

10    surfaces where the virus may reside.  However, because these recommendations

11    have proven ineffective to minimize the spread of COVID-19, containment efforts

12    have led to civil authorities issuing orders closing non-essential business

13    establishments, including restaurants, bars, hotels, theaters, personal care salons,

14    gyms, and schools, and mandating social distancing among the population.  This has

15    caused the cancelation of sporting events, parades, and concerts, the closure of

16    amusement parks, and substantial travel restrictions.  In addition, to conserve

17    medical supplies, orders have been issued prohibiting the performance of non-urgent

18    or non-emergency elective procedures and surgeries, forcing the suspension of

19    operations at many medical, surgical, therapeutic, and dental practices.

---

[23] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html (last visited Apr. 27, 2020).

[24] *See* Kampf, *supra* note 18 (remains infectious from two hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, UCSF (Feb. 13, 2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar. 19, 2020), https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

35.    On March 4, 2020, California Governor Gavin Newsom declared a state of emergency statewide.  On March 12, 2020, Gov. Newsom issued an executive order directing California residents to cancel large non-essential gatherings.  On March 19, 2020, Gov. Newsom issued Executive Order N-33-20, which required all residents to stay home except as needed to maintain continuity of operations of the federal critical infrastructure sectors.  In addition, on March 16, 2020, the Mayor of the City of San Diego issued Executive Order No. 2020-1, prohibiting any gathering of 50 or more people and discouraging all non-essential gatherings of any size.  The Mayor's executive order has since been extended until April 30, 2020.

36.    In addition to California, all but six states have enacted a COVID-19 Civil Authority Order, including but not limited to "stay-at-home" or "shelter-in-place" orders; 35 states have closed all non-essential businesses with other states enacting measures to curtail business operations; all 50 states have closed schools; and all but one state has closed restaurants and bars for services other than take-out and delivery.[25]

**B.    Defendants' Standard Commercial Property Insurance Policies**

37.    Farmers' insurance policies issued to plaintiff and other Class members are standard commercial property polices that cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

38.    Plaintiff's Farmers Policy, as well as the policies of other Class members, is a standard form used by Farmers for all insureds with applicable coverage.

39.    Among the coverages provided by Plaintiff's Farmers Policy was business interruption insurance, which, generally, would indemnify plaintiff for lost income and profits if its business was shut down.

---

[25] *See* Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address- coronavirus/.

40.     Kingray's Businessowners Special Property Coverage Form, Form BP 00 02 01 97, provided coverage as follows:

**(1)     Business Income**

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

\* \* \*

We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage.

**(2)     Extended Business Income**

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a)     Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b)     Ends on the earlier of:

(i)     The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

(ii)     30 consecutive days after the date determined in (2)(a) above.

41.     Kingray's Businessowners Special Property Coverage Form, Form BP 00 02 01 97, provided coverage as follows:

**i.     Civil Authority.**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

- 13 -

The coverage for necessary Extra Expense will begin immediately after the time of that action and ends:

(1)    3 consecutive weeks after the time of that action; or

(2)    When your Business Income coverage ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance.

42.    In addition, Kingray's Businessowners Special Property Coverage Form, Form BP 00 02 01 97, provided coverage as follows:

**g.    Extra Expense**

(1)    We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(a)    The portion of the building which you rent, lease or occupy; and

(b)    Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(2)    Extra Expense means expense incurred:

(a)    To avoid or minimize the suspension of business and to continue "operations":

(i)    At the described premises; or

(ii)    At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b)    To minimize the suspension of business if you cannot continue "operations"

- 14 -

43.     Under Kingray's Businessowners Special Property Coverage Form, Form BP 00 02 01 97, Business Income is defined as:

(i)     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage has occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii)    Continuing normal operating expenses incurred, including payroll.

44.     The interruption of plaintiff's and other Class members' businesses was not caused by any of the exclusions set forth in the applicable policies, including Plaintiff's Farmers Policy.

45.     Kingray's policy contains a Mold and Microorganism Exclusion, which purports to exclude "[a]ny loss, cost or expense arising out the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effect of 'mold' or 'microorganism', by any insured or by any other person or entity."

46.     Plaintiff's Mold and Microorganism Exclusion in its policy does not exclude plaintiff's losses because the efficient proximate cause of losses was precautionary measures taken by its state to prevent the spread of COVID-19 in the future, not because coronavirus was found on or around plaintiff's insured property.

47.     Kingray's policy also contains an Exclusion of Loss Due to Virus or Bacteria, which excludes "loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

48.     Plaintiff's Exclusion of Loss Due to Virus or Bacteria provision in its policy does not exclude plaintiff's losses because the efficient proximate cause of losses was precautionary measures taken by its state to prevent the spread of

- 15 -

COVID-19 in the future, not because coronavirus was found on or around plaintiff's insured property.

49. Plaintiff's policy also contains a Limited Coverage for Fungi, Wet Rot, Dry Rot, and Bacteria provision, which excludes from coverage:

(a) The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria; or

(b) The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet or dry rot or bacteria.

50. Plaintiff's Limited Coverage for Fungi, Wet Rot, Dry Rot, and Bacteria provision in its policy does not exclude plaintiff's losses because the efficient proximate cause of losses was precautionary measures taken by its state to prevent the spread of COVID-19 in the future, not because coronavirus was found on or around plaintiff's insured property.

51. Plaintiff and all Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

52. Notwithstanding the foregoing, Farmers denied Kingray's claim for business interruption losses by telephone on April 23, 2020.

C.    **The COVID-19 Pandemic Has Affected Policyholders Nationwide**

53. COVID-19 is physically impacting private commercial property throughout the United States and the State of California, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

54. Farmers does not intend to cover losses caused by the COVID-19 pandemic as part of business interruption coverage. As aforementioned, Farmers

- 16 -

denied plaintiff's claim by telephone on April 23, 2020, even though Kingray was forced to close its entire 150-capacity dining room due to the COVID-19 Civil Authority Orders.  On information and belief, Farmers has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also: (a) the Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an Economic Injury Disaster Loan ("EIDL") loan;[26] and (b) American's SBDC, whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[27]

55.    As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments re-open, small businesses will almost certainly still be under social-distancing mandates, including inside restaurants like Kingray, and will continue to experience diminishing revenues due to the loss of covered property.

56.    A declaratory judgment determining that the business income loss and extra expense coverage provided in standard Farmers commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent plaintiff and similarly situated Class members from being denied critical coverage for which they have paid premiums.

---

[26]  *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_Information_and_Documentation_-_3-30-2020_FINAL_2_pm.pdf (last visited Apr. 30, 2020).

[27]  *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

- 17 -

**CLASS ALLEGATIONS**

57.    Plaintiff brings this lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) individually and on behalf of all other persons similarly situated.

58.    The Nationwide Class is defined as:

All persons and entities who have entered into a standard commercial property insurance policy with a Farmers insurance carrier to insure property in the United States, where such policy provides for business income loss and extra expense coverage and does not exclude coverage for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

The California Sub-Class is defined as:

All persons and entities who have entered into a standard commercial property insurance policy with a Farmers insurance carrier to insure property in California, where such policy provides for business income loss and extra expense coverage and does not exclude coverage for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

Excluded from each of the Classes are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

59.    Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Classes following the discovery period and before the Court determines whether class certification is appropriate.

60.    Certification of plaintiff's claims for class-wide treatment is appropriate because plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

61.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Classes number at least in the hundreds and consists of geographically dispersed

1   business entities who are insured for business interruption losses. Farmers sells many

2   insurance policies nationwide and in the State of California and, therefore, joinder

3   of the Class members is impracticable.

4         62.    The identity of Class members is ascertainable, as the names and

5   addresses of all Class members can be identified in Farmers' or their agent's books

6   and records.   Plaintiff anticipates providing appropriate notice to the certified

7   Classes in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved

8   by the Court after class certification, or pursuant to court order under Fed. R. Civ. P.

9   23(d).

10           **Typicality**

11         63.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3)

12   because plaintiff's claims are typical of the claims of each of the Class members, as

13   all Class members were and are similarly affected and their claims arise from the

14   same standard policy provisions entered into with Farmers.  Each Class member's

15   insurance policy contains the same form providing coverage for business income

16   loss.  None of the forms exclude coverage due to a governmental action intended to

17   reduce the effect of the ongoing global pandemic.   As a result, a declaratory

18   judgment as to the rights and obligations under plaintiff's policy will address the

19   rights and obligations of all Class members.

20           **Adequacy of Representation**

21         64.    Plaintiff is committed to prosecuting the action, will fairly and

22   adequately protect the interests of Class members, and has retained counsel

23   competent and experienced in class action litigation, including litigation relating to

24   insurance policies.  Plaintiff has no interests antagonistic to or in conflict with other

25   Class members.   Plaintiff anticipates no difficulty in the management of this

26   litigation as a class action.

27

28

1    **Commonality**

2    65.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2)

3    because there are questions of law and fact that are common to each of the Classes.

4    These common questions predominate over any questions affecting only individual

5    Class members.  The questions of law and fact common to the Classes include, but

6    are not limited to:

7            (a)    Whether there is an actual controversy between plaintiff and

8    Farmers as to the rights, duties, responsibilities and obligations of the parties under

9    the business interruption coverage provisions in standard commercial property

10   insurance policies;

11           (b)    Whether measures to reduce the spread of the COVID-19

12   pandemic are excluded from plaintiff's and Class members' standard commercial

13   property insurance policies;

14           (c)    Whether the measures put in place by civil authorities to stop the

15   spread of COVID-19 caused physical loss or damage to the covered commercial

16   property;

17           (d)    Whether Farmers has repudiated and breached the insurance

18   policies with business interruption coverage by denying or intending to deny claims

19   for coverage; and

20           (e)    Whether plaintiff and Class members suffered damages as a

21   result of the breach by Farmers.

22   **Superiority/Predominance**

23   66.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A

24   class action is superior to other available methods for the fair and efficient

25   adjudication of the rights of the Class members.  The joinder of individual Class

26   members is impracticable because of the vast number of Class members who have

27   purchased commercial property insurance policies from Defendants.

28

67.    Because a declaratory judgment as to the rights and obligations under the uniform insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to Farmers, by even a small fraction of the Class members, would be enormous.

68.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, conserves the resources of both the judiciary and the parties far better, and protects the rights of each Class member far more effectively.  The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.  Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).  Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

69.    Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any class into subclasses.

**Rule 23(b)(2) Certification**

70.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2).  The prosecution of separate actions by individual Class members would create a risk of

- 21 -

inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants.

71.    In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

72.    Defendants have also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## COUNT I

### DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

69.    Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

70.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

71.    Plaintiff's Farmers Policy, as well as those of the other Class members, is a contract under which Farmers was paid premiums in exchange for its contractual agreement to pay plaintiff's, and the other Class members', losses for claims covered by the policy.

72.    As part of standard business interruption coverage, Farmers agreed to pay for insureds' loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration." Farmers also agreed to pay its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. "Business Income" under the policies means the "Net Income (Net

Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

73. The COVID-19 Civil Authority Orders caused direct physical loss and damage to plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Business Income provision of plaintiff's and the other Class members' Farmers policies.

74. Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Farmers or Farmers is estopped from asserting them. Yet Farmers has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide the coverage to which plaintiff and Class members are entitled.

75. Farmers has denied plaintiff's and other Class members' claims for business interruption losses caused by COVID-19 Civil Authority Orders on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

76. An actual case or controversy exists regarding plaintiff's and the other Class members' rights and Farmers' obligations under the policies to pay for losses incurred by plaintiff and the other Class members in connection with the business interruption caused by COVID-19 Civil Authority Orders.

77. Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court as follows:

i.    Plaintiff's and the other Class members' Business Income losses incurred due to COVID-19 Civil Authority Orders are insured losses under their Farmers policies; and

ii.    Farmers is obligated to pay plaintiff and other Class members for the full amount of their Business Income losses (up to the maximum allowable amount under the policies) incurred in connection with the

- 23 -

COVID-19 Civil Authority Orders during the period of restoration and the necessary interruption of their businesses stemming therefrom.

## COUNT II

### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

73.    Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

74.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

75.    Plaintiff's Farmers Policy, as well as those of other Class members, is a contract under which Farmers was paid premiums in exchange for its promise to pay plaintiff's, and the other Class members', losses for claims covered by the policies.

76.    As part of standard business interruption coverage, Farmers agreed to pay for insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."  Farmers also agreed to pay its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage.  "Business Income" under the policies means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

77.    The COVID-19 Civil Authority Orders caused direct physical loss and damage to plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties.  Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Business Income provision of plaintiff's and the other Class members' Farmers policies.

Cases\4832-0432-1467.v1-5/4/20

78.    Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Farmers and/or Farmers is estopped from asserting them.  Yet Farmers has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

79.    By denying coverage for any Business Income loss incurred by plaintiff or other Class members as a result of the COVID-19 Civil Authority Orders, Farmers has breached its coverage obligations under the policies.

80.    As a result of Farmers' breaches of contract, plaintiff and other Class members have sustained substantial damages for which Farmers is liable in an amount to be established at trial.

## COUNT II

### DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
### (Claim Brought on Behalf of the Nationwide Class and California Sub-Class)

81.    Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

82.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

83.    Plaintiff's Farmers Policy, as well as those of other Class members, is a contract under which Farmers was paid premiums in exchange for its promise to pay plaintiff's, and other Class members', losses for claims covered by the policy.

84.    Plaintiff's Farmers Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under plaintiff's and the other Class members' Farmers policies.

Cases\4832-0432-1467.v1-5/4/20

85.    Plaintiff and Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Farmers and/or Farmers is estopped from asserting them.  Yet Farmers has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which plaintiff and Class members are entitled.

86.    Farmers has denied claims related to COVID-19 on a uniform and class wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

87.    An actual case or controversy exists regarding plaintiff's and other Class members' rights and Farmers' obligations under the policies to reimburse plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by plaintiff and other Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

88.    Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

i.    Plaintiff's and other Class members' Civil Authority losses incurred in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

ii.    Farmers is obligated to pay plaintiff and other Class members for the full amount of their Civil Authority losses (up to the maximum allowable amount under the policies) incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

## COUNT III

### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

89.    Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

90.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

91.    Plaintiff's Farmers Policy, as well as those of other Class members, is a contract under which Farmers was paid premiums in exchange for its promise to pay plaintiff's, and the other Class Members', losses for claims covered by the policy.

92.    Plaintiff's Farmers Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under plaintiff's and the other Class members' Farmers policies.

93.    Plaintiff and the other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Farmers and/or Farmers is estopped from asserting them.  Yet Farmers has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

94.    By denying coverage for any business losses incurred by plaintiff and other Class members in connection with the COVID-19 Civil Authority Orders, Farmers has breached its coverage obligations under the policies.

95.    As a result of Farmers' breaches of contract, plaintiff and other Class members have sustained substantial damages for which Farmers is liable in an amount to be established at trial.

**COUNT IV**

**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

96.    Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

97.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and the California Sub-Class.

98.    Plaintiff's Farmers Policy, as well as those of other Class Members, is a contract under which Farmers was paid premiums in exchange for its promise to pay plaintiff's, and other Class members', losses for claims covered by the policies.

99.    Plaintiff's Farmers Policy provided that Farmers would pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises.  "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.  Due to the COVID-19 Civil Authority Orders, plaintiff and other Class members incurred Extra Expense at their Covered Properties.

100.    Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Farmers and/or Farmers is estopped from asserting them.  Yet Farmers has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which plaintiff and Class members are entitled.

101.    Farmers has denied claims related to COVID-19 on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

Cases\4832-0432-1467.v1-5/4/20

102.   An actual case or controversy exists regarding plaintiff's and other Class members' rights and Farmers' obligations under the policies to reimburse plaintiff and the other Class members for the full amount of Extra Expense losses incurred by plaintiff and Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

103.   Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

i.     Plaintiff's and other Class members' Extra Expense losses incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

ii.    Farmers is obligated to pay plaintiff and other Class members for the full amount of their Extra Expenses losses (up to the maximum allowable amount under the policies) in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

## COUNT V

### BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (Claim Brought on Behalf of the Nationwide Class and California Sub-Class)

104.   Plaintiff repeats the allegations in paragraphs 1-72 set forth above as if fully set forth herein.

105.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

106.   Plaintiff's Farmers Policy, as well as those of the other Class members, is a contract under which Farmers was paid premiums in exchange for its promise to pay plaintiff's, and the other Class members', losses for claims covered by the policy.

107.   Plaintiff's Farmers Policy provided that Farmers agreed to pay necessary Extra Expense that it incurred during the "period of restoration" that would not have incurred if there had been no direct physical loss or damage to the

Cases\4832-0432-1467.v1-5/4/20

described premises.  "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.  Due to the COVID-19 Civil Authority Orders, plaintiff and other Class members incurred Extra Expense at their Covered Properties.

108.   Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Farmers and/or Farmers is estopped from asserting them.  Yet Farmers has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

109.   By denying coverage for any business losses incurred by plaintiff and other Class members in connection with the COVID-19 Civil Authority Orders, Farmers has breached its coverage obligations under the policies.

110.   As a result of Farmers' breaches of the policies, plaintiff and the other Class members have sustained substantial damages for which Farmers is liable in an amount to be established at trial.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all similarly situated individuals and entities, prays for relief and judgment against Defendants as follows:

A.    Determining that this action is a proper class action under one or more provisions of Federal Rule of Civil Procedure 23, appointing plaintiff to serve as a Class Representative and appointing its counsel to serve as Class Counsel;

B.    Issuing a Declaratory Judgment declaring the parties' rights and obligations under the insurance policy provisions at issue;

C.    Awarding plaintiff and the Classes compensatory damages against Defendants, jointly and severally, for all damages sustained as a result of Defendants' breach of the policies in an amount to be proven at trial, including interest thereon;

Cases\4832-0432-1467.v1-5/4/20

D.     Awarding plaintiff and the Classes pre-judgment and post-judgment interest as well as reasonable attorneys' fees and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  May 04, 2020                                LAW OFFICE OF ROBERT
                                                                  G. LOEWY, P.C.
                                                                  ROBERT G. LOEWY


                                                                  */s/ Robert G. Loewy*
                                                                  Robert G. Loewy

                                                                  20 Enterprise, Suite 310
                                                                  Aliso Viejo, CA  92656
                                                                  Telephone:  949/468-7150
                                                                  rloewy@rloewy.com

                                                                  ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                                  RACHEL L. JENSEN
                                                                  655 West Broadway, Suite 1900
                                                                  San Diego, CA  92101
                                                                  Telephone:  619/231-1058
                                                                  619/231-7423 (fax)
                                                                  racheli@rgrdlaw.com

                                                                  ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                                  PAUL J. GELLER
                                                                  STUART A. DAVIDSON
                                                                  120 East Palmetto Park Road, Suite 500
                                                                  Boca Raton, FL  33432
                                                                  Telephone:  561/750-3000
                                                                  561/750-3364 (fax)
                                                                  pgeller@rgrdlaw.com
                                                                  sdavidson@rgrdlaw.com

                                                                  ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                                  SAMUEL H. RUDMAN
                                                                  58 South Service Road, Suite 200
                                                                  Melville, NY  11747
                                                                  Telephone:  631/367-7100
                                                                  631/367-1173 (fax)
                                                                  srudman@rgrdlaw.com

- 31 -

CARELLA, BYRNE, CECCHI,
    OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI
LINDSEY H. TAYLOR
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
STEPHEN A. WEISS
77 Water Street, 8th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
sweiss@seegerweiss.com

ZWERLING, SCHACHTER &
    ZWERLING, LLP
ROBERT SCHACHTER
41 Madison Avenue
New York, NY 10010
Telephone:  212/223-3900
212/371-5969 (fax)
rschachter@zsz.com

Attorneys for Plaintiff

Cases\4832-0432-1467.v1-5/4/20